812 A.2d 312

Nancy R. STANSBURY,

v.

Randy Q. JONES, et al.

No. 15, Sept. Term, 2002.

Court of Appeals of Maryland.

Dec. 13, 2002.

Charles R. Schaller (Anthony G. Gorski, Sarah Andrews of Schaller & Gorski, LLP, of Annapolis), on brief, for petitioner.

Sager A. Williams, Jr. (Blumenthal, Delavan & Williams, P.A., Annapolis), on brief, for respondents.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, Judge.

Nancy R. Stansbury, petitioner, petitions this Court to reverse the decision of the Court of Special Appeals. A zoning administrator in Anne Arundel County had recommended that Ms. Stansbury be granted certain variances in respect to property owned by her in the subdivision of Pleasant Plains in Anne Arundel County, a parcel of property that petitioner had reserved to herself in the re-subdivision of a larger tract. The Anne Arundel County Board of Appeals (hereafter "Board") had not accepted the recommendation, and had denied the variances, allegedly, on the sole ground that the claimed hardships there alleged had been self-created. Upon petition for judicial review, the circuit court had remanded the matter to the Board, directing that the Board reconsider the application considering all of the variance factors contained in the county zoning code. Randy Q. Jones, and others, respondents, appealed that decision to the Court of Special Appeals. That court reversed the decision of the Circuit Court for Anne Arundel County, holding that the hardship alleged in the case was self-created and that no other factors needed to be considered in the denial of the application.

The crux of the controversy at the circuit court level was, whether the Board, during an administrative appeal, should have declined to accept the recommendation of the administrative hearing officer on the sole ground that the need for the variances had been self-created by the petitioner. The Court of Special Appeals, agreeing with the Board that the hardship had been self-created, stated:

"First, it was thought by the circuit court that judicial review of the Board's decision was governed by the APA. Second, a recent trilogy of Court of Appeals' decisions involving critical area variances were read by the circuit court as requiring the Board to address each variance standard. Third, the circuit court failed to recognize the fundamental nature of the principle that self-created hardships cannot justify the grant of a variance, including the concept that a self-created hardship is not merely another variance standard, but is instead an essential part of the unwarranted hardship standard that is the primary determining factor that must be met by a variance applicant."

In her brief in this Court, petitioner presents four questions:

"1. Is the examination of just one factor alone, specifically the concept of self-created hardship, sufficient basis to deny a critical area variance request for a legally buildable lot, thereby precluding the use of the other factors in determining whether unwarranted hardship [1] exists?

"2. Did the Court of Special Appeals and Anne Arundel County Board of Appeals commit reversible error by

---

1. Most jurisdictions have adopted the position that when a court is concerned with area variances, such as that in the present case, practical difficulty is the standard, and when use variances are sought, unwarranted hardship is the standard for the approval of a variance. We noted in *Loyola Federal Saving and Loan Ass'n v. Buschman et al.,* 227 Md. 243, 248–49, 176 A.2d 355, 358–59 (1961), that "Rathkopf, ..., points out that use variances are customarily concerned with 'hardship cases'.... Rathkopf next points out that area variances are customarily concerned with 'practical difficulty'.... "[T]he basis for this lesser

failing to examine all statutory factors in determining whether unwarranted hardship exists when denying a variance in the Chesapeake Bay Critical Area for a legally buildable lot created with Anne Arundel County approval?

"3. Was the Circuit Court correct in remanding the case to the Board of Appeals for further consideration because the Board of Appeals' administrative decision incorrectly applied the law and lacked adequate findings of fact?

"4. Did the Anne Arundel County Board of Appeals effect a 'taking' of Petitioner's property without just compensation by denying Petitioner the requested variances on a legally buildable lot?" [2]

---

requirement ... is that the character of the zoning district is not changed .... variances going to such matters as area, height, or setbacks, are much less drastic than those affecting the use of property." The Anne Arundel County zoning provisions, in that regard, in a general provision section, Section 11 102.1.(a) provide that the requirements of the statute, may be varied "when it is alleged that practical difficulties or unnecessary hardships prevent carrying out the strict letter of this article." Section 11–102.1.(a)(2) provides, as relevant here, that a variance may be granted if "because of exceptional circumstances ... the grant of a variance is necessary to avoid practical difficulties or unnecessary hardship, and to enable the applicant to develop such lot." Accordingly, except to the extent that the application for variances includes a request for variances that are for portions of the parcel located in the critical area, in which event that particular request would be subjected to the unwarranted hardship standard, the correct standard in Anne Arundel County is the lesser standard of "practical difficulties" to the extent that petitioner's application concerns requests for area variances. The parties appear to presume that the unwarranted hardship standard applies to all of petitioner's variance requests. That is correct if all of the requests involve critical area requirements. It would not be correct as to the requests for other variances. In light of our holding that the evidence does not support that there was a self-created hardship and our remand to the Board for it to consider the application without reference to self-created hardship, it is not necessary for us to sort the requests as to the applicable standard.

**2.** Petitioner in her brief has framed the four issues above. In her petition she only presented two questions for our consideration. How-

Because, in the first instance, we shall hold that the facts of this case do not support the intermediate appellate court's judgment or the Board's findings that the hardship in this case was self-created, we shall not resolve, although we may discuss, the other issues presented. Accordingly, we shall reverse the decision of the Court of Special Appeals, and direct it to affirm the circuit court's judgment remanding the case to the Board to reconsider the petitioner's request for variances utilizing all of the applicable requirements of the statute. The hardship or practical difficulty here, if any, arising out of the re-subdivision, was not self-created within the meaning of the local ordinance. When a property owner does that which is permitted, or required, under a zoning code, that property owner is not necessarily creating an automatic hardship for purposes of the self-created hardship standards of variance provisions.

## Facts

In 1927, petitioner's predecessor in title, by recording a plat in the County land records, created a subdivision known as Plat No. 2 Pleasant Plains. At that time, as far as the record reflects, there was no subdivision ordinance existing in Anne Arundel County. At sometime prior to, and/or in 1986, Anne Arundel County passed an ordinance or ordinances which resulted in the lots in the then Pleasant Plains subdivision, becoming substandard size lots, *i.e.*, non-conforming lots. The County, in 1986, enacted statutory provisions that the parties refer to as the Antiquated Lots Law (now codified in Article 28, Section 2–101 of the Anne Arundel County Code ("Code")). Charlene Morgan, the zoning analyst for the Anne Arundel County Department of Planning and Code Enforcement, testified before the Board as to the effect of the 1986 statutory provisions on the property here at issue:

---

ever, in the argument contained in her petition she did at least touch on the other issues. Because of our resolution of this case we will not directly answer the questions respondents challenge as being un-preserved.

"I'm going to go briefly through the history the way the county has reviewed it.

"In 1924 Pleasant Plains was platted. The lots were required to [be] create[d], by recorded plat prior to the county code. The lots were considered legally created antiquated lots.

"In 1986 the Antiquated Lots Law was passed which was bill 86–86, and is now codified into article 28, section 2–101C. This required antiquated lots that are in ownership to be combined to meet lot area requirement.

"In 1986 planning and rezoning—dated March 6th, 1986, explained to the owner of this property that they needed to be combined in regard to bill 86–86.

"In 1991 an Administrative plat was signed on July 31st and the plat combined legal Pleasant Plains lots into larger building sites.

"On these particular sites a reserved parcel label was assigned to the subject lot until it could pass a perk test. To my definition, and my understanding a reserved parcel means that this lot is on hold until it can meet that criteria.

"At this time the subject site does not lose it's underlying legal status. And as a—indicates that there are many legal lots that are not filling it, and that in the county view the words 'parcel and lot' are used interchangeably and don't indicate whether the lot is legal or buildable.

"In 1997 waiver 5867 was signed on September 11th and that waiver deems a lot buildable because the lot perked at that time.

"The waiver is the subdivision approval that is needed that is referenced on the plat that waives the need to rerecord the administrative plat. Typically an administrative plat is not recorded unless there's a change in the lot lines. In this case all that was deemed done [by] removing the term 'reserved parcel' and making it a lot.

"This site has always been, and is now a subject of permit review of critical area criteria and Health Department requirements, as is any legal lot. And any legal lot has the

right to apply for a variance during the building permit review."

The 1986 Antiquated Lots Law, as now codified as aforesaid, provides in relevant part that:

"(a) In this section 'properly recorded lot' means a lot:

(1) of record and created in compliance with the zoning and subdivision regulations in effect when the lot was created; or

(2) recorded on or before June 30, 1952.

"(b) Notwithstanding the minimum lot area and width requirements of this title, a residential dwelling may be constructed on a properly recorded lot if:

(1) the lot was not in the same ownership as an adjacent unimproved lot on January 1, 1987; and

(2) the other requirements of this article are met.

"(c) ... [A] residential dwelling may not be constructed on a properly recorded lot that was in the same ownership as one or more adjacent unimproved lots on January 1, 1987 ... unless the adjacent lots are combined to meet or come as close as possible to meeting the area requirements for the residential district in which the lot is located." [3]

---

3. There is a body of case law in the land use context concerning the merger of sub-standard lots. In *Friends of the Ridge v. Baltimore Gas and Electric Company*, 352 Md. 645, 653, 724 A.2d 34, 38 (1999), a case in which protestants were challenging the utilities' right to combine lots into larger parcels, thereby eliminating interior lot lines, we noted:

"These efforts have resulted in the creation and evolution in zoning of the doctrine of merger, which, in zoning cases, generally prohibits the use of individual substandard parcels if contiguous parcels have been, at the relevant time, in the same ownership and at the time of that ownership, the combined parcel was not substandard."

We noted that we were unaware, at that time, of any prior Maryland cases expressly adopting that doctrine. We then concluded that generally, where the doctrine had been recognized, its primary function had been to prohibit the re-subdivision of 'combined' lots into *smaller* substandard lots. In *Friends* we noted numerous cases in other jurisdictions concerning the doctrine: *Loechner v. Campoli*, 49 N.J. 504, 231 A.2d 553 (1967); *Somol v. Board of Adjustment*, 277 N.J.Super. 220, 228, 649 A.2d 422, 426 (1994) ("[S]eparate undersized but contiguous lots fronting on the same street in single ownership ordinarily merge

## Anne Arundel County Variance Standards

Sections 11–102.1(c) of the Anne Arundel County Code, applicable to the granting of variances, provides as to the general consideration of variances that:

"(c) A variance may not be granted unless it is found:

(1) that the variance is the minimum variance necessary to afford relief;

(2) that the granting of the variance will not:

(i) alter the essential character of the neighborhood or district in which the lot is located;

(ii) substantially impair the appropriate use or development of adjacent property;

(iii) reduce forest cover in the limited and resource conservation areas of the critical area;

(iv) be contrary to acceptable clearing and replanting practices required for development in the critical or bog protection area; or

(v) be detrimental to the public welfare; and

(3) that, for properties in the critical area or a bog protection area, the granting of a variance will not be inconsistent with the spirit and intent of the critical area program or bog protection program and will not adversely affect water quality or adversely impact fish, wildlife, or plant habitat."

As can be seen, there is no specific provision relating to self-created hardship in the general provisions of the Anne Arundel County ordinance. There is, however, a special section in the Anne Arundel County Code, Section 11–102.1.(b), that

into one lot and conveyance of a portion will require subdivision and variance approval."); *Iannucci v. Zoning Board of Appeals,* 25 Conn. App. 85, 592 A.2d 970 (1991); *In re Appeal of Gregor,* 156 Pa.Cmwlth. 418, 627 A.2d 308 (1993); and *Skelley v. Zoning Board of Review,* 569 A.2d 1054, 1056 (R.I.1990) ("The concept of merger of contiguous nonconforming lots in common ownership as an appropriate method to combine nonconforming lots is gaining increased recognition.").

What the Antiquated Lots Law does, is to essentially codify the doctrine of lot combination –or lot merger.

relates only to properties in the "critical area or a bog protection area." It does contain a self-created hardship type of provision. Section 11–102.1.(b)(4)(i) provides: "the variance request ... is not based on conditions or circumstances that are the result of actions by the applicant." Petitioner indicated in the present case that the Critical Area Commission had not objected to her application. Respondents did not proffer to the contrary. Accordingly, except as noted, the extent to which self-created hardships under the general provisions of this statute would impact upon the granting of a variance outside the critical area (whether sufficient in and of itself to justify the denial of a variance, or whether merely a factor to consider along with all other factors in the consideration of the variance application) depends upon the holdings of our cases. While the critical area variance provisions contain a direct reference to self-created hardships, the statute does not attempt to define what is meant by "result of actions by the applicant." Therefore, even in respect to property within the critical areas of the county, whether a particular situation constitutes a self-created hardship, depends, for the most part, upon our cases to the extent we have previously addressed such issues, not upon the provisions of the statute.

### Standard of Judicial Review

Almost a half-century ago, in a case involving a denial of a use permit, we stated: "It is a clearly established rule in the law of zoning that a court may not substitute its judgment for that of the Zoning Board." *Dorsey Enterprises, Inc. v. Shpak,* 219 Md. 16, 23, 147 A.2d 853, 857 (1959). Chief Judge Hammond wrote for the Court in *State Ins. Comm'r v. National Bureau of Casualty Underwriters,* 248 Md. 292, 309, 236 A.2d 282, 292 (1967), that "under ... [either] of the standards the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached (alteration added)."

Whether reasoning minds could reasonably reach a conclusion from facts in the record is the essential test. If such a conclusion is sufficiently supported by the evidence,

then it is based upon substantial evidence. Forty years ago in *Snowden v. Mayor and City Council of Baltimore,* 224 Md. 443, 447–48, 168 A.2d 390, 392 (1961), we noted that:

"The substantial evidence test 'means that the reviewing court's inquiry is whether on the record the agency could reasonably make the finding.' ... Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' The heart of the fact finding process often is the drawing of inferences from the facts. The administrative agency is the one to whom is committed the drawing of whatever inferences reasonably are to be drawn from the factual evidence. 'The Court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness.' " [Citation omitted.]

Over twenty years later we opined, "if the evidence makes the issue of harm fairly debatable, the matter is one for the Board's decision, and should not be second-guessed by an appellate court." *Board of County Commissioners for Cecil County v. Holbrook,* 314 Md. 210, 218, 550 A.2d 664, 668 (1988). *See also Ramsay, Scarlett & Co., Inc. v. Comptroller of the Treasury,* 302 Md. 825, 490 A.2d 1296 (1985) and *Comptroller of the Treasury v. World Book Childcraft International, Inc.,* 67 Md.App. 424, 508 A.2d 148 (1986).

In *White v. North,* 356 Md. 31, 44, 736 A.2d 1072, 1079 (1999), we much more recently restated the general standard of review that:

"In judicial review of zoning matters, including special exceptions and variances, 'the correct test to be applied is whether the issue before the administrative body is "fairly debatable," that is, whether its determination is based upon evidence from which reasonable persons could come to different conclusions.' *Sembly v. County Bd. of Appeals,* 269 Md. 177, 182, 304 A.2d 814, 818 (1973). *See also Board of County Comm'rs v. Holbrook,* 314 Md. 210, 216–17, 550 A.2d 664, 668 (1988); *Prince George's County v. Meininger,* 264 Md. 148, 151, 285 A.2d 649, 651 (1972); *Zengerle v. Board of*

*County Comm'rs,* 262 Md. 1, 17, 276 A.2d 646, 654 (1971); *Gerachis v. Montgomery County Bd. of Appeals,* 261 Md. 153, 156, 274 A.2d 379, 381 (1971). For its conclusion to be fairly debatable, the administrative agency overseeing the variance decision must have 'substantial evidence' on the record supporting its decision. *See Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 395, 396 A.2d 1080, 1087 (1979); *Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 706, 376 A.2d 483, 495 (1977), *cert. denied sub nom. Funger v. Montgomery County,* 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 769 (1978); *Agneslane, Inc. v. Lucas,* 247 Md. 612, 619, 233 A.2d 757, 761 (1967)."

*See also People's Counsel for Baltimore County v. Mangione,* 85 Md.App. 738, 743–44, 584 A.2d 1318, 1320–21 (1991); *Terranova v. Board of Trustees of the Fire and Police Employees Retirement Sys.,* 81 Md.App. 1, 8–9, 566 A.2d 497, 500–01 (1989), *cert. denied,* 319 Md. 484, 573 A.2d 808 (1990); *Tennison v. Shomette,* 38 Md.App. 1, 5, 379 A.2d 187, 190 (1977), *cert. denied,* 282 Md. 739 (1978); *Fitzgerald v. Montgomery County,* 37 Md.App. 148, 153, 376 A.2d 1125, 1128, *cert. denied,* 281 Md. 737 (1977), *cert. denied sub nom. Mutyambizi v. Maryland,* 439 U.S. 854, 99 S.Ct. 164, 58 L.Ed.2d 160 (1978); *Anne Arundel County v. Maryland Nat'l Bank,* 32 Md.App. 437, 440, 361 A.2d 134, 136 (1976).

Nonetheless, we have also indicated in our cases that where an administrative agency's conclusions are not supported by competent and substantial evidence, or where the agency draws impermissible or unreasonable inferences and conclusions from undisputed evidence, such decisions are due no deference. In *Belvoir Farms Homeowners Association, Inc. v. North,* 355 Md. 259, 267–68, 734 A.2d 227, 232 (1999), we stated:

"Generally, a decision of an administrative agency, including a local zoning board, is owed no deference when its conclusions are based upon an error of law. *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 569, 709 A.2d 749, 753 (1998) ('[W]e may reverse an administrative decision premised on erroneous legal conclusions.' (citing *Peo-*

*ple's Counsel v. Maryland Marine Mfg. Co.,* 316 Md. 491, 497, 560 A.2d 32, 34–35 (1989)))."

In *Maryland Marine Mfg., supra,* 316 Md. at 496–97, 560 A.2d at 34–35, we said:

"As we have frequently indicated, the order of an administrative agency must be upheld on judicial review if it is not based on an error of law, *and if the agency's conclusions reasonably may be based upon the facts proven.* But a reviewing court is under no constraints in reversing an administrative decision which is premised solely upon an erroneous conclusion of law." [Citation omitted.] [Emphasis added.]

We noted in *Washington National Arena Limited Partnership v. Comptroller of the Treasury,* 308 Md. 370, 378, 519 A.2d 1277, 1281 (1987) (quoting *Ramsay, Scarlett & Co.,* 302 Md. at 834, 490 A.2d at 1301), that: " 'a reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law.' "

We said in *Elliott v. Joyce,* 233 Md. 76, 81–82, 195 A.2d 254, 256 (1963) that:

"We hold that 'on the record' before us, the Board could not 'reasonably make' the reclassification and grant the special exception. Therefore, its action in so doing was arbitrary and capricious in a legal sense. To permit a gasoline station in the residential surroundings of the subject property would not promote the safety, health or general welfare of the community, but would constitute, we think, invalid 'spot zoning.' *Baylis v. City of Baltimore,* 219 Md. 164, 148 A.2d 429 [1959]; *Hewitt v. County Comm'rs,* 220 Md. 48, 151 A.2d 144 [1959]." [Alterations added.]

■ The standard in respect to judicial review is, generally, the same whether the agency grants or denies relief. In *Maryland Advertising Company v. Mayor and City Council of Baltimore,* 199 Md. 214, 222–23, 86 A.2d 169, 173–74 (1952), a case involving the denial of permit for a billboard under the

special provisions in that zoning code, the trial court, on judicial review, affirmed the agency. We reversed, noting:

> "A zoning statute, ordinance or administrative order ... is presumed to be valid.... However, the duty of the courts not to substitute their judgment for the judgment of legislative or administrative authorities ... is not more imperative than the power and duty to set aside any purported exercise of such power which is in fact arbitrary, capricious or confiscatory. Zoning in this respect can no more escape judicial review than any other purported exercise of the police power.... 'The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare.' ... 'Building on one's own land is still a property right, subject to all applicable provisions of law; it is not a grant of a favor from some governmental authority.' " [Citations omitted.]

We have additionally found actions of zoning entities to be arbitrary and capricious, and have thus affirmed trial court reversals of zoning agency decisions in reclassification cases, albeit the reversals were generally of actions where the agency had granted relief, as opposed to the instant variance application where the Board denied relief. As indicated, in *Elliott, supra,* we affirmed the circuit court's reversal of agency actions. In *Zang & Sons, Builders Inc. v. Taylor,* 203 Md. 628, 102 A.2d 723 (1954), the circuit court declared a zoning action (a reclassification) by Anne Arundel County authorities, 'null and void,' and this Court affirmed. There we said:

> "There is nothing here to show that the [prior] rezoning to 'Cottage Residential' was error or mistake ... The preamble to the resolution and the personal knowledge of the Commissioners could not be considered [by the circuit court] as evidence of change. The power of rezoning cannot be used to 'favor'. *The Courts review the action, not the opinion, of the Commissioners. The reasonableness of such*

*a resolution is to be determined by the facts from which the conclusion is drawn, rather than from the conclusion itself.*" *Id.* 203 Md. at 636–37, 102 A.2d at 727. [Citations omitted.] [Emphasis added.] [Alterations added.]

*Price v. Cohen,* 213 Md. 457, 463, 463, 132 A.2d 125, 128 (1957), was another case where the courts reversed a zoning entity's granting of a reclassification. There, we stated:

"The courts will reverse only where there are no grounds for reasonable debate and where the action of the Board is capricious, arbitrary, discriminatory, or illegal. The Board here based its opinion partly on an inspection of the property by its members. *The personal knowledge of the Board cannot be considered on appeal. The review of the courts is made from the facts from which the conclusion is drawn and not from the conclusion itself.*" [Citation omitted.] [Emphasis added.]

In the case *sub judice,* the Board erroneously construed a property owner's legal attempt to comply with provisions authorized by a new county law as a self-created hardship. Compliance with a statute ordinarily is not self-created hardship and is not such in the present case.

### Self-created Hardship

We stated in *White,* 356 Md. at 48–49, 736 A.2d at 1082, quoting from our earlier case of *Aspen Hill Venture v. Montgomery County Council,* 265 Md. 303, 313–14, 289 A.2d 303, 308 (1972), that:

" 'we must not forget the underlying principle that, "Such ordinances [zoning ordinances] are in derogation of the common law right to use private property as to realize its highest utility, and while they should be liberally construed to accomplish their plain purpose and intent, they should not be extended by implication to cases not clearly within the scope of the purpose and intent manifest in their language." *Landay v. Board of Zoning Appeals,* 173 Md. 460, 466, 196 A. 293 (1938).' [Alteration in original.]

"In *Landay,* 173 Md. at 465, 196 A. at 295–96, we noted that '[i]n a constitutional sense, the only justification for the

restrictions . . . on the use of private property is the protection of the public health, safety, or morals.' "

In a case somewhat similar to the case *sub judice*, *Richard Roeser Professional Builder, Incorporated v. Anne Arundel County*, 368 Md. 294, 297 n. 3, 793 A.2d 545, 547 n. 3 (2002), decided after the Board's and the lower court decisions in the present case, we initially noted in a footnote:

"It is a relatively common practice throughout the State, and has been for decades, that buyers contract to buy properties with contingencies that make consummation of the contract conditioned on the granting of variances. . . . Additionally, in such instances in respect to 'area' variances, we have never held that such a practice, by itself, constitutes a 'self-created' hardship."

Then, in *Roeser*, 368 Md. at 303–04, 793 A.2d at 551, quoting from Arden H. Rathkopf & Daren A. Rathkopf, *The Law of Zoning and Planning* § 58.22, 141–48 (Edward H. Zeigler, Jr. revision, vol. 3, West 1991), we stated:

" '*In other words, because a purchaser of property acquires no greater right to a variance than his predecessor, he should not be held to acquire less.*

. . .

'It should not be within the discretion of a board of appeals to deny a variance solely because a purchaser bought with knowledge of zoning restrictions. . . .' " [Emphasis in original.] [Footnotes omitted.]

We subsequently opined in *Roeser* that:

"The types of hardships that are normally considered to be self-created in cases of this type do not arise from purchase, but from the actions of the land owner . . . that create the hardship, rather than the hardship impact, if any, of the zoning ordinance on the property."

*Id.* at 314, 793 A.2d at 558.

■ While we do not rely on the impact, if any, of the Antiquated Lots Law in our decision for the case *sub judice*, it is clear that the purpose of the Antiquated Lots Law ordi-

nance is to induce owners of adjacent non-conforming under-sized lots to combine them into lots that conform to present area requirements, or to combine them into lots that are less non-conforming than prior to combination, in order to develop the property. Clearly, any person or persons that want to build a residential dwelling on an undersized, but legal, par-cel [4] or lot of land adjacent to other land owned by them, is, at the least, encouraged to comply with this ordinance. Compli-ance with the provisions of the Anne Arundel County Antiqu-ated Lots Law [5] would not be self-created hardship. In the present case the petitioner was merely doing what she had a

4. In Anne Arundel County a "parcel" of land fits within the definition of a lot for zoning purposes. Article 28, Section 1–101. Definitions—Generally, paragraph (36) provides " 'Lot' has the meaning stated in § 1–109 of this title." Section 1–109(a) provides: "In this article, 'lot' means a *portion* of a subdivision or any other *parcel* of land for building development, whether existing, immediate, or future . . . ." (emphasis added.)

5. This type of ordinance is not unique to Anne Arundel County. The Supreme Court of Rhode Island, in *Redman v. Zoning and Platting Board of Review of the Town of Narragansett*, 491 A.2d 998, 998–99 (R.I.1985), in a case remarkably factually similar to the case at bar, described the statute there involved:
 "Narragansett Town Council enacted an amendment to its zoning ordinance that required each lot to have a frontage of one hundred feet and a total area of ten thousand square feet. Section 8.2 of that ordinance provided that
 '[i]f adjacent land in the same ownership is not sufficient to meet the minimum frontage requirements or minimum area require-ments, or both, then the largest area and frontage which the adjoining common ownership make possible shall be provided.'
 "Thus, the terms of the amended ordinance required petitioners, as joint owners of lot 126, now a substandard lot of record, and of lot 125, an adjacent lot, to merge the two lots to permit lot 126 to meet the minimum frontage and area requirements of the zoning ordi-nance."
 Another similar case is *Sciacca v. Caruso*, 769 A.2d 578 (R.I.2001). There the Town of Johnson had amended its zoning ordinance in 1979, mandating greater area requirements. The new ordinance also con-tained "a so-called merger provision, pursuant to which contiguous lot Nos. 91 and 92 merged into one lot to meet this particular . . . minimum lot area and frontage requirements." *Id.* 769 A.2d at 579–80 (footnote omitted). It required contiguous substandard lots in the same ownership to be merged in order to meet the new standards, or in order to meet the new standards as much as possible. Caruso applied to the

right to do, and what the Antiquated Lots Law encouraged her to do, re-subdivide the property and in the process, meet the current requirements of the statute so that the lots would be in conformity.

Respondents rely in part on *Randolph Hills, Inc. v. Montgomery County Council*, 264 Md. 78, 285 A.2d 620 (1972), for the proposition that problems created by a developer in creating a subdivision can be considered self-created. The facts in *Randolph Hills* were substantially different than the facts in the present case. The owners in Randolph Hills were not requesting a variance. In *Randolph Hills*, the owner was merely requesting a reclassification of its property under pre-existing law. Prior to the request for reclassification, the developer had voluntarily subdivided a large portion of the overall property under the provisions of the same ordinance, leaving a certain portion of the property it owned entirely outside of the subdivision. It was the property left outside the subdivision that was the subject of the zoning reclassification request, not, as in the present case, property within the subdivision for which variance relief was sought. Generally, reclassifications involving Euclidean zones, such as involved in *Randolph Hills*, are controlled by the "change/mistake rule," [6] a rule not applicable in variance cases. Nonetheless, the administrative body in *Randolph Hills*, perhaps as dicta, opined that the developer had created its own hardship by

---

local planning board, which had the authority to approve subdivisions, to re-subdivide lots, she had previously combined pursuant to the ordinance, into their previous sub-standard size. The planning entity illegally approved her request. She then sought a variance in order to construct a residence on the new substandard lots on the basis that they were legal non-conforming lots prior to their combination. The Supreme Court of Rhode Island held that her alleged hardship had been self-created by her attempt to undo the statutory combining of her lots and reversed the lower court that had upheld the agency's granting of a variance.

6. In order to qualify for a Euclidean zoning reclassification, an applicant, generally, must first establish that the current classification was a mistake when it occurred, or that there has been sufficient change in the neighborhood since the prior classification, to warrant the consideration of a change in classification.

leaving the subject tract outside the subdivision. In the case *sub judice*, the Reserved Parcel 2 is included within the re-subdivision that meets the requirements of current statutes and the only issues are whether the re-subdivision that combined sub-standard lots into the conforming "Reserved Parcel 2" was done in compliance with the applicable statutes.[7] As we have clearly indicated, the re-subdivision, *i.e.*, the combination of substandard lots, is not only permitted and encouraged by the statute anytime adjacent non-conforming lots are under the same ownership, regardless of how the property became so titled,[8] it is, generally, permitted for substandard lots to be re-subdivided into standard or closer-to-standard lots.

In *Randolph Hills* the property outside of the subdivision ended up in the situation solely because the developer

---

7. Respondents argue in their brief that prior to the re-subdivision of the development, petitioner and her brother, after learning of the potential for the passage of the Antiquated Lots Law, had adjusted their ownership from tenants in common to sole ownership of the lots in checkerboard fashion, with them owning alternate sub-standard lots. Respondents apparently are proffering that because there was a method whereby petitioner might have avoided compliance with the spirit and letter of the law, a later decision to comply, makes that compliance self-created hardship for purposes of variance consideration. We disagree. As we read the statute, anytime abutting substandard lots are in, or come under, sole ownership, they are required to be 'merged' or 'combined'. It makes no difference, as we read the statute, whether owners or prior owners have attempted to avoid compliance.

 In any event, the Antiquated Lots Law, even if it did not require the combination of lots which we believe it did, permitted, and strongly encouraged, lot combining in order to avoid a proliferation of non-conforming lots. While not squarely presented in this case, we doubt that a property owner that brings a property into legal conformance as to one standard is self-creating a hardship as to another standard so as to foreclose the ability of such an owner to apply for variance relief as to other matters, a right that is generally available via variance procedures to any owner. To posit to the contrary would be to encourage the continuation of non-conforming properties. One of the underlying basic tenets of zoning law is that non-conforming lots and uses are to be brought into conformance if at all possible. *See also* our discussion of the doctrine of merger in footnote 3.

8. We have not been asked to, nor do we, consider the legality or constitutionality of such mandatory "combining" or "merger" provisions.

desired it. In the present case the recombination of lots, and thus a re-subdivision, was permitted by statute. In the process of re-subdivision the tract at issue here ended up in a subdivision with a condition imposed by the county not imposed on the other lots. The parcel, to the extent it would reflect the old subdivision, would be a nonconforming parcel and its status would have resulted from the statute increasing dimension requirements, and, thus, any hardship resulting from the statute making the lots non-conforming, would not have been self-created. To the extent, if any, it reflects a status derived from the combination re-subdivision, its status would have resulted from the operation of the new "lot-combining" statute, and any hardship was not self-created. More important, subdividing property in accordance with all applicable statutes does not, generally, constitute a self-created hardship in respect to the property within the subdivision. *Randolph Hills* does not apply here.

Respondents next rely on the Court of Special Appeals decision in *Cromwell v. Ward*, 102 Md.App. 691, 651 A.2d 424 (1995). The facts of *Cromwell* are completely dissimilar to the facts in the present case. *Cromwell* involved an after the fact application for a variance to legalize an illegally constructed building. First, and primarily, there was no subsequent statute that permitted the landowner, Ward, to do what he did. He merely constructed a building that violated the provisions of the existing zoning code, as well as the provisions of the plans upon which his building permit was issued. He was caught. He then requested a variance approving retroactively what he had already illegally built. The intermediate appellate court held that he was not entitled to a variance because his hardship was entirely self-created. *Cromwell* represents the traditional application of self-created hardship principles in the variance context and is a far cry from the present situation, where a statute permitted to be done, what was done.

Our case of *Ad + Soil, Inc. v. County Comm'rs of Queen Anne's County*, 307 Md. 307, 513 A.2d 893 (1986), is also factually dissimilar. Ad + Soil, without prior proper approvals, constructed a facility that violated the county's zoning

ordinance, including the setback requirements of the ordinance. After the fact, Ad + Soil applied for variances of the setback (and other) requirements. We held that the setback violations had been self-created. Again *Ad + Soil*, like *Cromwell*, was a traditional application of self-created hardship principles in a zoning context—an attempt to legalize an illegal structure.

*Montgomery County Council v. Kacur*, 253 Md. 220, 252 A.2d 832, 838–39 (1969), also relied upon by respondents, is likewise inapplicable. First of all, as in *Randolph Hills*, it was a request for a reclassification and not an application for variances. More importantly, when we said "a property owner may not *require* the Council to grant a rezoning ... by creating a hardship situation of his own making in which he cannot but lose money," we were addressing the situation where a landowner, considering the uses permissible under the zoning classification of the property when he bought it, had paid too much money for a piece of property and was trying to have its classification designation changed to a higher category solely in an attempt to make it more valuable for resale. *Kacur*, 253 Md. at 231, 252 A.2d at 838–39. The factual situation there is nowhere close to the situation in the case at bar.

*Evans v. Shore Communications, Inc.*, 112 Md.App. 284, 685 A.2d 454 (1996), involved the denial, not the granting of variances. Again it was factually dissimilar. The intermediate appellate court, as relevant here, found that the claimed peculiarity, uniqueness, of the property necessary to satisfy the first prong of most variance ordinances—that a property be unique, was that the applicant had leased a piece of property for which, pursuant to the then existing ordinance, he could not erect the tower to the required height. The applicant there did not claim that a hardship existed for the main purposes of establishing an unwarranted hardship, but merely made the argument that a lease it had entered into in anticipation of receiving a variance caused the property to be unique or constituted peculiar circumstances surrounding the property, thereby satisfying the first uniqueness prong of the

variance requirement of that particular ordinance (and many others). That court said that "while SCI ... may have painted itself into a corner when it entered into a lease agreement ... 'the variance that is desired ... cannot be the source of the first [uniqueness] prong of the variance process....'" *Evans,* 112 Md.App. at 308, 685 A.2d at 466 (citing *Cromwell,* 102 Md.App. at 695, 651 A.2d at 426) (alteration added). The applicant in *Evans* asserted that the uniqueness of the property allegedly caused by the lease, was, itself, an unwarranted hardship. Only in that context did the court say:

> "the second 'special condition and circumstance' claimed by SCI—the needs of its subscribers—are not peculiar to the land, but created by SCI.... The needs of SCI's customers have nothing to do with the peculiarity of the property in question. Thus, any hardship claimed by SCI—the second prong of the test—is self-inflicted, and thus not a ground for a variance." *Evans,* 112 Md.App. at 309, 685 A.2d at 466.

Accordingly, as is evident, *Evans* does not support the position as to that case, taken by respondents in the case *sub judice.*

The case of *Wilson v. Mayor and Comm'rs of the Town of Elkton,* 35 Md.App. 417, 371 A.2d 443 (1977), also relied on by respondents, is equally distinguishable from the present case. In that case, the property owner at the pertinent time, unlawfully extended a non-conforming use. Later, a variance was sought that would make using the illegal extension easier. It was held that the unlawful extension had been self-created and thus the need for the requested relief was self-created. It was also a traditional self-created hardship situation. Wilson by his sole affirmative act had built a structure that illegally extended a non-conforming use and was attempting to legalize the use. *Wilson* is simply not relevant to the issues in the case at bar.

The cases cited by respondents do not support the proposition they ask this court to adopt in the present case. In similar fashion, the other cases relied on by the intermediate appellate court do not apply in the circumstances of the present case.

In addition to extensively relying on this Court's case of *Randolph Hills, supra,* and relying on its own case of *Cromwell, supra,* which reliance as we have indicated was misplaced, the Court of Special Appeals also cited as authority our cases of *Salisbury Board of Zoning Appeals v. Bounds,* 240 Md. 547, 214 A.2d 810 (1965) and *Marino v. Mayor and City Council of Baltimore,* 215 Md. 206, 137 A.2d 198 (1957).

*Bounds* and *Marino* are also dissimilar from the case at bar. In *Bounds,* the property owner did not properly procure a building permit to convert an old single family dwelling into four apartments. Therefore, the apartments were built without any consideration by the appropriate city entities as to whether the conversion complied with local zoning provisions. The conversion violated the density provisions of the statute. We stated the then relevant provision set forth in Rathkopf, *The Law of Zoning and Planning,* that we considered to be applicable:

" 'If the peculiar circumstances which render the property incapable of being used in accordance with the restrictions contained in the ordinance have been themselves caused or created by the property owner or his predecessor in title, the essential basis for a variance, i.e., that the hardship be caused *solely* through the manner of the operation of the ordinance . . . is lacking . . . . the hardship, arising as a result of the act of the owner . . . will be regarded as having been self-created, barring relief.' " *Bounds,* 240 Md. at 554, 214 A.2d at 814.

We then held in *Bounds:*

"The instant case fits squarely within the above general rule. The construction of the fourth apartment and the resultant hardship could have been avoided if the appellees had used proper diligence in ascertaining what the density requirements were. . . . The hardship here relied on was *entirely* self-created." *Id.* at 555, 214 A.2d at 814–15. [Emphasis added.]

*Bounds,* like *Wilson,*[9] involved the building or remodeling of structures in violation of zoning laws, and the subsequent attempt to legalize a prior illegality by way of the granting of variances. It was a traditional case of self-created hardship.

The case of *Marino* was substantially different from the present case. It involved a "special exception."[10] Along with other things, we noted that under the Baltimore City ordinance the Marinos had the burden of establishing that the hardship they were alleging was not self-created. We also noted that the zoning ordinance being challenged had been in place when the Marinos had purchased the property.[11]

---

9. *Wilson* also involved the remodeling of an existing building into more units than permitted under the zoning code. After the fact, Wilson sought a variance to provide outside stairway access to a third unit he had already constructed. The third unit was prohibited. The authorities only discovered the violation when he applied for a permit to build the stairs.

10. In *Marino,* 215 Md. at 216, 137 A.2d at 201, we stated:
"Ordinarily, there is a marked distinction in the law of zoning between a *variance* and an *exception,* but there is none in Baltimore City since an *exception* apparently overlaps a *variance* inasmuch as both may be granted where there are 'practical difficulties or unnecessary hardships'. This is the reason why many cases which arise in Baltimore City, such as this one, discuss exceptions and variances without differentiation." [Footnote omitted.]

11. Under the Supreme Court's case of *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), and our recent case of *Roeser, supra,* the fact that the statute predated an owner's purchase of a subject property would have no bearing on the ability of an owner to seek variance relief. As we indicated in *Roeser,* a purchaser receives as a part of his title to property, unless the conveyance is limited, all the rights his or her predecessor had in the property, including the right to apply for variance relief. Purchase is not a self-created hardship. To the extent the dicta in *Mayor and City Council of Baltimore v. Sapero,* 230 Md. 291, 297, 186 A.2d 884, 887–88 (1962), states that "when a person purchases property with the intention of applying for a variance ... he can not contend that such restrictions cause him such peculiar hardship that entitles him to special privileges which he seeks." conflicts with the Supreme Court's case of *Palazzolo* or our case of *Roeser,* it is rejected.
Cases from some other jurisdictions are in accord with and actually predate *Palazzolo* and *Roeser. See Rocheleau v. Town of Greene,* 708 A.2d 660 (Me.1998); *In the Matter of Galin v. Board of Estimate of the City of New York,* 52 N.Y.2d 869, 878, 437 N.Y.S.2d 80, 418 N.E.2d 673,

More important, the Marinos had applied for and received a prior exception that permitted them to use the property for commercial purposes. That prior grant of Marino's application to permit commercial use, we found "[i]s without doubt one of the reasons why the remainder is less adaptable now for residential use purposes." *Marino*, 215 Md. at 220, 137 A.2d at 203. It is clear that the situation in *Marino* was very different than the situation in the case at bar. Here the petitioner re-subdivided her property, and in the process

---

678 (1981) ("if the other four conditions are met, acquisition with knowledge of the Zoning Resolution provisions does not constitute a self-created hardship."); *Johnny Cake, Inc. v. Zoning Board of Appeals of the Town of Burlington*, 180 Conn. 296, 300–01, 429 A.2d 883, 885 (1980) ("But if the hardship is created by the enactment of a zoning ordinance and the owner of the parcel could have sought a variance, then the purchaser has the same right to seek a variance and, if his request is supported in law, to obtain the variance. . . . Otherwise the zoning ordinance could be unjust and confiscatory."); and *see Lewis v. Pickering*, 134 Vt. 22, 26–27, 349 A.2d 715, 717–18 (1975), where the Supreme Court of Vermont discussed its cases and the case law of New Jersey:

"Had it still been owned by Myers, the predecessor in title, and he had made application for a variance such as was sought by the defendants, certainly no claim could have been raised that he had created his own hardship.

. . .

"In *Wilson v. Borough of Mountainside*, 42 N.J. 426, 453, 201 A.2d 540, 554 (1964), the New Jersey Supreme Court stated:

'We wish to make it clear that if a prior owner would be entitled to such relief, that right is not lost to a purchaser simply because he bought with knowledge of the zoning regulation involved. This situation is not within the realm of the self-created hardship which will generally bar relief.'

"We also cite, with approval, the following language from *Griffin Construction Corp. v. Board of Adjustment of Teaneck*, 85 N.J.Super. 472, 205 A.2d 313, 316 (1964):

'[W]here an original owner would be entitled to a variance under a specific set of facts, any successor in title is ordinarily entitled to such a variance, providing that no owner in the chain of title since the adoption of the zoning restriction has done anything to create the condition for which relief by variance is sought.' "

Under the cases, it is clear, that an owner's attempts to comply with a new ordinance, such as attempts to comply with the Antiquated Lots Law at issue in this case, are not the types of actions that the cases would say would permit the consideration of those actions to be deemed self-created hardships in the process of determining whether variances are appropriate.

eliminated, and/or reduced the nonconforming character of the lots within the subdivision. As is permitted, in the process she ended up with certain lots that still had certain potential environmental constraints, but they were constraints that she had a right to attempt to resolve through the variance process. In the re-subdivision process she was reducing the degree of non-conformity of her property.

Although we do not hold in this case that re-subdividing in compliance with statutes can never constitute self-created hardships, such actions are not in the traditional sense, in general, self-created hardships for variance consideration purposes. Traditionally, self-created hardship requires an affirmative action, exclusively by a property owner or his predecessor in title, that is itself the sole reason for the need for the variance. *Bounds* and *Marino* represent the normal types of affirmative actions by property owners that will be held to constitute self-created hardships. Several of our sister jurisdictions have recognized similar types of self-created hardship in the variance context.

In *Dueger v. Zoning Board of Appeals of the Incorporated Village of Lloyd Harbor*, 61 N.Y.2d 743, 472 N.Y.S.2d 922, 460 N.E.2d 1357 (1984), the Court of Appeals of New York held that a deck illegally extended into a setback was a self-created hardship, and a variance was denied in spite of the fact that the removal of the deck would substantially impair the value of the house. The Supreme Court of Oklahoma, in *Board of Adjustment of the City of Oklahoma City v. Puckett*, 1960 Ok. 142, 353 P.2d 4 (1960), held that the construction of a ground level parking pad in a setback in order to support a carport structure that was forbidden to be placed in the setback, and the moving of driveways in contemplation of the carport placement and other structures, constituted self-created hardships and reversed the granting of the variance. In *Bloom v. Zoning Board of Appeals of the City of Norwalk*, 233 Conn. 198, 658 A.2d 559 (1995), the Supreme Court of Connecticut reversed the granting of a variance that had been obtained in order to legalize a dormer and stoop that had been constructed on a non-conforming structure pursuant to an illegal build-

ing permit. Other cases that have held that illegal construction is self-created hardship include: *Caccia v. Zoning Board of Review of the City of Providence*, 83 R.I. 146, 113 A.2d 870 (1955); *Snyder v. Waukesha County Zoning Board of Adjustment*, 74 Wis.2d 468, 247 N.W.2d 98 (1976) and *Martirano v. Zoning Board of Appeals of the Town of Lewisboro*, 57 N.Y.2d 867, 456 N.Y.S.2d 47, 442 N.E.2d 445 (1982) (both cases involved the illegal construction of porches); *Markdale Corporation v. Board of Appeals of City of Milwaukee*, 27 Wis.2d 154, 133 N.W.2d 795 (1965); and *Ex Parte Chapman*, 485 So.2d 1161 (Ala.1986). There are also cases that have held that a hardship created by the error of a surveyor working for the land owner constitutes a traditional self-created hardship. *In re Application of Fecteau*, 149 Vt. 319, 543 A.2d 693 (1988) and *Pollard v. Zoning Board of Appeals of the City of Norwalk*, 186 Conn. 32, 438 A.2d 1186 (1982). Creating a substandard parcel by a metes and bounds description in a deed was held to be a self-created hardship in *Cherry Hill Homes, Inc. v. Board of Zoning Appeals of the Incorporated Village of Sea Cliff*, 28 N.Y.2d 381, 322 N.Y.S.2d 225, 271 N.E.2d 211 (1971). In *Foxhall Community Citizens Association v. District of Columbia Board of Zoning Adjustment*, 524 A.2d 759 (D.C.App.1987), the court held that a church that was so poorly designed that it was unable to perform its current functions was not entitled to a variance for the purposes of remodeling because the inferior design had been self-created. *And see Sciacca, supra.*

What occurred in the case at bar is more similar to what occurred in *Whittaker v. Zoning Board of Appeals of the Town of Trumbull*, 179 Conn. 650, 427 A.2d 1346 (1980), where a prospective purchaser, Esposito, obtained a variance for the re-subdivision of property he was buying. Whittaker, and other land owners in the original subdivision, petitioned the issue to the courts. The prior subdivision had been approved with the understanding that a public road, eventually, would be extended through the middle of the property. There was an indication on the prior plat that a cul-de-sac was intended to be temporary and that a road might be extended in that

area in the future. The purpose of the re-subdividing at issue was to accommodate the extension of the public road, the contemplation of which was required by the public authorities at the time of the prior subdivision, by creating two lots, one on each side of where the authorities had wished to place the road. Whittaker argued that no true hardship had been demonstrated because the lot before the variance was granted was conforming and buildable and that the town had not taken the road area by condemnation, therefore the re-subdivision was not necessary and the division of the lot itself, into two lots, would be self-created. The Connecticut court opined:

"The plaintiffs argue essentially that the hardship complained of by Esposito is self-created and, therefore, that the variance was improperly granted. We do not agree.

. . .

"The hardship which justifies a board of zoning appeals in granting a variance must be one that originates in the zoning ordinance. . . .

"The applicant for the variance, Esposito, was presented with a genuine hardship beyond his control and not of his or the record owner's making. The 1.79 acre parcel involved has been designated as the location through which Quail Trail is to extend to connect to Foster Avenue since 1969, when the town planning and zoning commission approved the Lagana subdivision upon that condition.

"Esposito's application for a variance was filed . . . long after the commission's 1969 decision to extend Quail Trail was expressed in an official map. . . .

. . .

"Under the circumstances of this case, the extension of Quail Trail can hardly be said to be the voluntary act of Esposito." · *Whittaker*, 179 Conn. at 657–61, 427 A.2d at 1350–52. [Footnote omitted.]

In the present case, before the re-subdivision of the development, the undersized lots would not have been self-

created hardships because they were legal lots, albeit perhaps non-conforming lots. When a governmental statute permits and encourages an owner, or owners, to take certain action in order to be able to utilize property, that action cannot be characterized as self-created.

 Once the process of subdivision or re-subdivision commences, it is not at all uncommon for there to be parcels or lots reserved by the owners and not offered for immediate sale or proposed for immediate use. Sometimes the reason for the existence of these parcels or lots is that, because they contain environmentally sensitive areas, the owner intends to market the unencumbered lots first and later attempt to see if the affected lots or parcels can be approved for development. Often these reserved parcels have conditions attached to them at the direction of the governmental entity that approves the plats. When conditions are so imposed, the conditions, so long as they do not result in a taking of the property, are generally enforceable.

In *Howard County v. JJM, Incorporated*, 301 Md. 256, 270, 482 A.2d 908, 915 (1984), although it was a "Takings Clause" case, we described, in a somewhat limited manner, the nature of dedications and reservations, saying:

"We come down to the issue in this case, which is whether the Howard County subdivision regulation requiring JJM to reserve land for a proposed State highway constitutes an exercise of the County's police power or a taking. If the regulation is determined to be a valid exercise of the police power, then JJM has no legal cause for complaint. If, on the other hand, the regulation is determined to be a taking of the property, the County has no right to require the reservation for the proposed highway.

"D. Hagman, *Urban Planning and Land Development Control Law*, § 140 (1975) defines the terms dedication and reservation:

'Dedication ordinarily involves the conveyance of an interest in land by the fee owner to the public; usually to the local government having jurisdiction over the land.

Reservation, on the other hand, involves no conveyance but restricts the right of the subdivider and others to use the land for anything but the restricted purpose.' "

The "Reserved Parcel 2," in the present case, with the restriction as to percolation tests, in essence, constitutes a reservation of the property to the owner, but with a restriction that it cannot be used until such time as it passes the percolation requirements. Petitioner, as the re-subdividing property owner, was the person who reserved the parcel in her own ownership, and, albeit imposed by governmental regulation, placed the percolation restriction upon the use of her own property. As such, our interpretation of the nature of the designation and the restriction is subject to the body of property law we have developed in respect to the creation of restrictions, whether imposed by notations on plats or by a separate Declaration applicable to the property described on a particular plat. We addressed this issue, generally, in *Belleview Construction Company, Incorporated v. Rugby Hall Community Association, Incorporated*, 321 Md. 152, 158, 582 A.2d 493, 495 (1990), where we said, in construing covenant restrictions against a developer:

"If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement."

We had previously noted in *Woodland Beach Property Owners' Association, Incorporated v. Worley*, 253 Md. 442, 449–50, 252 A.2d 827, 831 (1969) (quoting *Brady v. Farley*, 193 Md. 255, 258, 66 A.2d 474, 475 (1949)) that:

" 'In the recent case of *Norris v. Williams*, 189 Md. 73, 76, 54 A.2d 331, 332, Judge Delaplaine speaking for the Court, said:

" ' "However, restrictions upon the use of land are in derogation of the natural right which an owner possesses to use and enjoy his property, and are repugnant to trade and commerce. Consequently, restrictive covenants are

construed strictly against their establishment and effect, and liberally in support of the unrestricted use of the land . . . ."

. . .

'There must be borne in mind the often repeated doctrine that doubts should be resolved in favor of the unrestricted use of property.' "

We said in *Peabody Heights Company of Baltimore City v. Willson,* 82 Md. 186, 203, 32 A. 386, 389 (1895), in reference to restrictions concerning approval of building plans and the timing of construction, that:

"[A]lthough one in conveying real estate may impose certain restrictions. . . . Courts will always favor a liberal interpretation . . . in order to impose as few difficulties as possible in the free use and disposal of the particular estate conveyed [or reserved]. . . . [I]f the words are doubtful, they will be resolved in favor of keeping the restriction within the narrowest limits. In other words, if there be doubt as to the intention of the parties, Courts will naturally lean in favor of freedom of the property." [Alterations added.]

*See also Markey v. Wolf,* 92 Md.App. 137, 151, 607 A.2d 82, 88–89 (1992), which quoted *Peabody.*

While in *Belleview* and cases since, we have modified the rule to be a reasonableness rule, the reservation in the present case, and the percolation restriction, even if ambiguous, which we do not believe they are, would be, even under the modified "reasonableness rule" of *Belleview,* construed to mean that the developer retained ("reserved") a parcel of land for her future use if that property could be, at anytime in the future, successfully percolated.

In the case *sub judice,* the restriction placed on the reserved parcel was that it could not be built upon until such time as it passed percolation tests. It is clear, and it was clearly the governmental agency's opinion, that if and when the parcel could be perked, it was a buildable lot. No other express limitations were contained on the plat. There was no

evidence that the county had imposed any conditions forbidding petitioner from seeking variances. In fact, there was ample evidence that the county considered the parcel to be a legal lot, restricted only by the necessity to conduct satisfactory percolation tests.

### Self-created Hardship as a Sole Factor

Petitioner presents the issue of whether self-created hardship, by itself, is sufficient to deny a variance without consideration of the remaining conditions contained in the ordinance. In other words, is it a sole disqualifying finding, or is it a factor to be considered along with other factors to determine whether practical difficulties or unwarranted hardships exist. The Board and the Court of Special Appeals held that in all cases, whether an area or a use variance is sought or whether practical difficulty or unwarranted hardship is the standard, a self-created hardship, by itself, is sufficient to deny the granting of a variance without any consideration of any other factors. In other words, if self-created hardship exists, the administrative entity need go no further.

We do have cases in which we have upheld the denial of variance relief where the agency has found that a self-created hardship existed. We have been unable to determine from the language of our cases whether this Court was ever expressly asked to address the question presented here—the issue of whether self-created hardship alone is sufficient to deny an area variance. We have appeared, in the absence of having it presented as a question by the parties in the various cases, to have assumed, without any extensive investigation of the matter, that it was sufficient.

We shall not resolve that issue in this case as we are holding that there is no self-created hardship in the first instance. Accordingly, we leave that issue for a future case, in so far as Maryland law is concerned.[12]

---

12. In respect to general variance statutes, several jurisdictions have considered the issue and held that it is only one of the factors to be considered, and other jurisdictions have even held that self-created

hardship is not a factor at all, when applications for area variances such as those sought in the case *sub judice* are concerned.

In *Human Development Services of Port Chester, Incorporated v. Zoning Board of Appeals of the Village of Port Chester*, 67 N.Y.2d 702, 706, 499 N.Y.S.2d 927, 490 N.E.2d 846, 848 (1986), a case in which a prior owner of the property had created a substandard lot, the intermediate appellate court in New York held:

"That a difficulty may be self-created is a factor to be taken into account, but as we held in *Matter of De Sena v. Board of Zoning Appeals* (45 N.Y.2d 105, 108[, 408 N.Y.S.2d 14, 379 N.E.2d 1144 (1978)]): *'A finding of self-created hardship normally should not in and of itself justify denial of an application for an area variance.'* " [Emphasis added.]

In *In the Matter of De Sena*, 45 N.Y.2d 105, 108, 408 N.Y.S.2d 14, 379 N.E.2d 1144, 1145 (1978), that Court stated that:

"That a landowner's difficulty is in a sense self-created is certainly a factor to be taken into account in considering an application for an area variance, although it is less significant a consideration in such cases than in those involving use variances. It is not, moreover, the determinative factor. . . ." [Citations omitted.]

In *Russell v. Board of Adjustment of the Borough of Tenafly*, 31 N.J. 58, 69, 155 A.2d 83, 89 (1959), the Supreme Court of New Jersey opined:

*"A decision on self-created hardship, without more, is not conclusive on the determinative issue of undue hardship.* Although self-created hardship weighs against the application, it is only a circumstance to be considered in finding undue hardship." [Citations omitted.] [Emphasis added.]

Our neighboring jurisdiction, the District of Columbia, very strongly supports the view that it is only one of the factors to be considered in determining the existence of "practical difficulties" or "unwarranted hardship." In *Carliner v. District of Columbia Board of Zoning Adjustment*, 412 A.2d 52, 54 (D.C.App.1980), the Court stated initially that, in respect to that instant case, the court was:

"unwilling to disturb the decision of the Board when it determines that the affirmative action of the applicant in making his property non-conforming, rather than his mere knowledge at the time of purchase that his property is non-conforming, warrants the application of the hardship doctrine and thereby justifies denial of the variance."

It then noted, however, that "This court has upheld the grant of a variance where the only 'hardship' was petitioner's mere knowledge of the difficulties created by the zoning requirements." *Id.* at 54 n. 3.

The facts in the case of *De Azcarate v. District of Columbia Board of Zoning Adjustment*, 388 A.2d 1233, 1235 (D.C.App.1978), were similar to the case at bar. The petitioners were persons who had protested the granting of a variance. There the court said:

"Lot 17, for which the Board granted the area variance was originally part of a considerably larger lot designated Lot 13. Lot 13 was a triangular-shaped parcel of a approximately 26,000 square feet. . . . During July 1975, Lot 13 was subdivided into three lots. . . . Subse-

quently, Lot 17 was enlarged slightly to include an additional strip of land and this subdivision was also recorded.

. . .

"As approved, Lot 17 was an irregular configuration. The main body of the property was connected to the street by a strip of land 30 feet wide and 70 feet long. A single-family home was to be constructed on the main portion of the lot. . . . [Pitkin] sold Lot 17 to intervenor—Schafer on condition that the property was suitable for the erection of a single-family residence. During this same time-frame, single-family homes were constructed upon each of the other two lots carved from the original Lot 13.

. . .

"However, a recent decision of this court undermines petitioner's argument. In that case, the Board granted a parking variance. After concluding that the Board properly treated the application as an area variance rather than as a use variance, the court rejected the petitioners' contention that the rule of self-created hardship applied.

. . .

"However, the hardship at issue here ... cannot be accurately described as the direct consequence of the intervenors' sole and affirmative acts; here the zoning department employees played a significant part by approving three separate applications during the original subdivision of Lot 13." *Id.* at 1235–39. [Citations omitted.] [Footnotes omitted.]

*See also Association for Preservation of 1700 Block of N Street, N.W., and Vicinity v. District of Columbia Board of Zoning Adjustment*, 384 A.2d 674, 677–78 (D.C.App.1978), *A.L.W., Inc. v. District of Columbia Board of Zoning Adjustment*, 338 A.2d 428, 431–32 (D.C.App.1975), where the court said:

"It has been the rule, to be sure ... that one with actual or constructive knowledge that under the zoning ... a particular use would be nonconforming, is ordinarily not entitled to receive a use variance.

"In the case before us, however, petitioner applied not for a use variance but an area variance. . . . Yet where a substandard lot is the subject of a hardship application, proof of only 'peculiar and exceptional difficulties' is involved. . . .

"Additionally, the fact that the owner knew or should have known of the area restrictions before he purchased the property does not alter the lesser standard. In New York, for instance, the rule seems to be

'that the "self created hardship" concept does not apply to area variance cases, i.e., the fact that the condition complained of was self created is not dispositive of the matter but only one factor to be considered ... [in passing on] an area variance.'. . .

"The Rhode Island Supreme Court has taken a similar position:

'The question of whether an applicant is entitled to a variance because of hardship flowing from a literal application of the terms of the ordinance is in no way dependent upon his knowledge of the existence of zoning restrictions affecting the land.'

At least one other jurisdiction with a statute similar to our own has indicated that the self-imposed aspect of a particular hardship is not

In the present case, the only condition required by Anne Arundel County was that the reserved parcel not be used until such time as it passed a percolation test. It imposed no other conditions. Often the need to reserve parcels is caused by then present circumstances that make the parcels, areas, or lots, then un-buildable, and thus, generally, unmarketable. Nonetheless, they are legal parcels or legal lots. They in fact are sellable, although rare may be the buyers for parcels with notations on the plats that they are presently defective, for whatever reason, as to building use. Later, if the circumstances change and the express and implied conditions placed upon the use of the property can be satisfied, the parcel stands in the same position as any other lot in respect to the right to seek variance relief. It is a legal parcel of property. The parcel in question has always been considered a legal lot by the county.

During the re-subdivision process permitted and encouraged by the Antiquated Lots Law and the pre-existing statute which placed the lots in nonconformance prior to the re-subdivision, the property combinations resulted in a parcel of land that was not then suitable for the erection of a residential structure because the portion of the parcel that remained after areas had been used for subdivision infra-structure would not, at that time, percolate or otherwise permit development due to critical area requirements.[13] The area was designated as a

---

a bar to the grant of a variance." [Citations omitted.] [Emphasis omitted.]

13. In the development of subdivisions and re-subdivisions there are normally areas that cannot easily be accommodated within the a standard box-like lot plan. It is rare that a perfect box or checkerboard lot layout can be accomplished due to the varying shapes that tracts of land have, over the years, taken. Generally, land within the boundaries of the plat that is not then identified with a lot number, unless provisions to the contrary are contained on the plat or in other title documents, remains in the ownership of the developer and, unless limited by conditions or language on the plat itself or by necessary implication, or limited by recorded declarations, it is, generally, not encumbered in respect to the owner's uses of the property. In such instances, in the absence of a statute to the contrary, it may, generally, be sold.

reserve parcel, *i.e.*, not then qualifying as real property upon which a house could be built. Nonetheless, the parcel remained the property of the subdivider. The only express restriction as to the reserve parcel is contained on the re-subdivision plat itself: "Reserve Parcel No. 2," "unbuildable until a passing perc test is performed." That limitation was required by Anne Arundel County authorities. The county subsequently approved the re-subdivision plat.[14]

It was clear to anyone examining the Administrative Plat that there was only one express limitation imposed on the subject property by the re-subdivision approval, *i.e.*, that no residences could be built on the parcel until, and if, it passed a percolation test. No other limitations were noted on the plat. Our examination of the record does not reflect that any other limitations were imposed on the parcel during the process.

 Subsequently, it was determined that there was an area within the parcel that could, and did, pass a percolation test. However, the use of that area for the sanitary system to be utilized for a residence on the parcel left an insufficient remaining area to accommodate the type of structure required to be built by covenants that affect the lots within the development and still be in compliance with "yard," and other requirements, both critical areas and otherwise, of the zoning ordinance. At that point, the petitioner sought the various approvals, by way of area variances, which would be needed in order for a residential structure to be constructed on the parcel. Because the land, or a portion of it, was either in the critical area, or the critical area buffer zone, review by the Chesapeake Bay Critical Area Commission also was sought. That Commission interposed no objection to the project. Petitioner then sought critical area and other variances necessary to accommodate her proposed project.[15] The relief she

---

14. Re-subdivision plats required under the Antiquated Lots Law are apparently designated as "Administrative Plats."

15. Respondents argue that because the property was re-subdivided after the county's Critical Area restrictions were enacted, petitioner self-

sought via the variance process was of the same type, if not scope, of the relief she might have had to seek had she never re-subdivided the property in the first instance.[16]

 Respondents proffer in their brief that "The very laws Stansbury seeks to abridge were in existence *before* she created her reserved parcel." To be sure, some, if not all, of

created any hardships caused by the enactment of those restrictions. That is incorrect. The property, however subdivided or not subdivided, would still have been subjected to the same Critical Area restrictions. Moreover, it was in essentially the same ownership after the re-subdivision as it was before. Even if ownership had changed after the enactment of the Critical Area provisions, the new owner could have asserted any rights the prior owner could have asserted, including the right to apply for variances. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 626–38 121 S.Ct. 2448, 2462–63, 150 L.Ed.2d 592, 612–14 (2001), where the United States Supreme Court, in a "Takings Clause" context, stated:

"The state court held the postregulation acquisition of title was fatal to the claim for deprivation of all economic use and to the *Penn Central[ Transp. Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)]* claim.

"The theory underlying the argument that post-enactment purchasers cannot challenge a regulation under the Takings Clause seems to run on these lines: Property rights are created by the State. So, the argument goes, by prospective legislation the State can shape and define property rights and reasonable investment—backed expectations, and subsequent owners cannot claim any injury from lost value. After all, they purchased or took title with notice of the limitation.

"The State may not put so potent a Hobbesian stick into the Lockean bundle. The right to improve property, of course, is subject to the reasonable exercise of state authority, including the enforcement of valid zoning and land-use restrictions. . . .

"A blanket rule that purchasers [or subdividers] with notice have no compensation right when a claim becomes ripe is to blunt an instrument to accord with the duty to compensate for what is taken [by a regulatory action]." [Citations omitted.] [Alterations added.]

16. She may have been able to market the lots as non-conforming lots prior to the resubdivision. While, generally, if structures are destroyed they may have to be rebuilt in conformance, land subdivisions are not, normally, destroyable. Thus, generally, lots would never have to be reconfigured in accordance with present statutes, but could continue on under non-conformance principles, although their marketability might be diminished. In other words, undersized lots would remain legal and buildable, albeit variance relief might, depending on current setback and similar requirements, be necessary to enable an owner, or a subsequent owner to construct a viable structure.

those laws were in effect prior to the re-subdivision. It was the impact of those "very laws" upon the preexisting lots and parcels that created the conditions necessitating the applications for the variances. Prior to the time those "very laws" were passed, Stansbury would have had the right to either rely on the non-conforming character of the lots, a nonconformity created by subsequent statute, or would have had the right to seek a variance of the statutory provisions that put the pre-existing lots out of conformity. The Antiquated Lots Law, which we presume respondents are referring to, created another potential restriction on petitioner's property by imposing a condition that adjacent lots had to be recombined, if in the same ownership, in an attempt to put the lots in conformity, or closer conformity, with the lot size requirements of the new statute. If the Antiquated Lots Law applied, petitioners re-subdivision brought the property into closer compliance. Permissive re-subdivision (or any subdivision for that matter) that decreases nonconformance is not a self-created hardship in respect to remaining small areas of property that require variance considerations before they may be developed.

## Conclusion

It is clear that the circumstances here present are far removed from the traditional concept of a self-created hardship. Petitioner, in re-subdividing in compliance with county requirements was left with, as is generally the case, a parcel of land not then buildable in that re-subdivision. In re-subdividing, which met the combination requirements and the requirement to file an Administrative Plat, and was in compliance with other county laws, she insured that the only express condition attached to her ability to fully use the reserve parcel was the provision in respect to percolation. There is no evidence in this case that the county intended to impose any other express conditions on the re-subdivision. It was equally clear that the county always considered this parcel to be a legal lot.

Therefore, the owner of the parcel is fully entitled to seek any relief that any other property owner is entitled to seek. She may not, on remand, get the relief, but she is entitled to try without having the Board or the courts disqualify her from seeking relief on the grounds that what occurred during her specific re-subdivision amounted to a self-created hardship. In light of our decision, we decline to resolve any other issues presented in this case.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND THE CASE IS REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS.**

Dissenting opinion by WILNER, J., in which RAKER, J., joins

The Board of Appeals for Anne Arundel County denied a set of fifteen requested variances upon a determination that the need for the variances was self-created by the applicant, Nancy Stansbury. That finding was amply supported by the evidence before the board. Proclaiming the issue to be one of law rather than fact, however, this Court simply weighs the evidence differently and concludes that the need for the variances, as a matter of law, was not self-created. With respect, I dissent from both the conclusion and the analysis employed by the Court. It ignores the relevant facts and it ignores the relevant law.

Scattered throughout the opinion are some general statements with which I agree. Early in the opinion, for example, the Court states that "[w]hen a property owner does that which is permitted, or required, under a zoning code, that property owner is not *necessarily* creating an automatic hardship for purposes of the self-created hardship standards of variance provisions." (Emphasis added). That is true. Later, the Court confirms the proposition that the mere purchas-

ing of land subject to a contingency that a needed variance will be granted also does not constitute a self-created hardship. I agree with that as well, and with the further statement that "subdividing property in accordance with all applicable statutes does not, generally, constitute a self-created hardship with respect to the property within the subdivision."

Where the Court goes astray, in my view, is extending those valid precepts to reach the wholly unwarranted conclusion that, when an owner knowingly re-subdivides property in a way that may otherwise be lawful but that, in an effort to maximize the overall economic value of the land, deliberately and unnecessarily creates one or more odd lots that do not comply with known applicable land use requirements, the owner cannot be denied the variances necessary to excuse compliance with those requirements on the ground of self-inflicted hardship. The Court thus seems to hold that, because the re-subdivision is not itself unlawful, the owner can deliberately create non-conforming lots and nonetheless be eligible for the necessary variances. That is an extraordinary extension—one that essentially stands the doctrine of self-inflicted hardship, and, indeed, land use law itself, on its head. No authority truly in point is cited for the extension, and for good reason. None supports it. Indeed, the authority truly in point, either dismissed or ignored by the Court, establishes exactly the opposite.

It is important to consider what actually occurred here. The original tract consisted of 347 acres. In 1924, most of the tract was subdivided into approximately 157 small rectangular lots, most of which were only 50 feet wide and ranged in size from 15,000 to 20,000 square feet (essentially between one-third and one-half an acre).[1] Until the 1990's, the land remained undeveloped. Ms. Stansbury and her brother, James, inherited the property from their father in 1985.

---

1. The only reference to this subdivision is to Plat No. 2 of Pleasant Plains contained in the record extract. It is not clear whether that plat, as printed in the extract, is complete, but it appears to contain 157 lots, not all of which are consecutively numbered.

At some point early in 1986, James made inquiry of the Anne Arundel County Office of Planning regarding the buildable status of the lots. In March, 1986, he was advised, in relevant part, that, although the subdivision was not subject to the 1970 subdivision regulations adopted by the county, he would be "required to combine whole lots to create building sites in order to meet setback requirements and the requirements of the Health Department." The Office explained that, under the current R 1 zoning, there was a minimum front setback of 40 feet, a minimum rear setback of 35 feet, and a minimum side setback of 15 feet. The letter also noted that three of the lots did not have "legal access" and, unless combined with other lots, would not be individually buildable. Finally, the letter advised that, although the Critical Area regulations recently adopted by the State would not affect the property, if the property was developed after the county enacted the environmental laws mandated by the Critical Area Protection Act, the property would be subject to the critical area laws.

On January 1, 1987, the county adopted an Antiquated Lots Law, which required the owners of more than one contiguous substandard lot to combine the non-conforming lots in order to meet current lot size and width standards. Under that ordinance, the Stansburys were required to reconfigure the 1924 lots in order to meet a minimum lot size of 40,000 square feet and a minimum lot width of 80 feet. In August, 1988, the county adopted its first permanent critical area law, under which the undeveloped subdivision was classified as a Resource Conservation Area (RCA)—the most environmentally sensitive of the three categories provided for in the Critical Areas Law. In February, 1989, the county comprehensively rezoned the undeveloped subdivision to RLD (Residential Low Density). That zoning also required a minimum lot size of 40,000 square feet, as well as a minimum lot width of 150 feet, and it limited density to one unit per five acres. Few, if any, of the 1924 lots owned by the Stansburys met those requirements. If the property was to be developed, the lots would have to be combined.

In December, 1990, the Stansburys submitted an application for re-subdivision. The new plat proposed 37 lots, most of which did not meet either the applicable lot size or lot width requirements. The plat also proposed the clearing of 44% of the critical area woodlands, although the regulations applicable to an RCA area limited the clearing to 20 percent. Initially, the plat showed the lot at issue here as part of an open space and storm water management area and not as a reserved lot. It appears—although the record is scant on this—that revised plans submitted in April, 1991, detached the parcel in question from the open space area and designated it as a reserved lot. Notwithstanding the failure of the proposed lots to meet the applicable size and width standards, the revised plat was approved in July, 1991. The only reference to the reserved lot—identified as Reserve Parcel No. 2—in the county's file is a handwritten notation on the Administrative Plat that the lot was "unbuildable until a passing perc test is performed." The evidence showed that this notation was added to the plat by a county official because the lot had recently failed a percolation test. The implication was not necessarily that the lot *would* be buildable if it *did* pass a percolation test but that it clearly would *not* be unless it *did.*

Following approval of the re-subdivision, the Stansburys began to market the new lots. In doing so, they emphasized the value of the reserved lot to adjoining lots, and they charged a significant premium for those lots. Evidence was presented that Ms. Stansbury told one buyer that, because the reserved parcel contained critical area wetlands and open space, it could never be developed and that his lot would cost more because the reserved parcel would "provide a buffer and enhance the value and enjoyment" of his lot. Buyers of other lots were charged premiums of up to $10,000 because of the unrestricted view they would have of the pristine reserved parcel.

In 1996, after most of the 37 lots were sold, Ms. Stansbury decided to develop the reserved lot and applied for a septic system permit for that lot. Because the lot had failed several percolation tests, however, compliance with the applicable

requirements for a standard septic system, which required a 10,000 square foot drainfield area, proved to be a problem. Therefore, Ms. Stansbury sought to avoid those requirements. In July, 1997, having purchased her brother's interest through a bankruptcy proceeding, she sought a waiver of the subdivision ordinance, which would have made the parcel a "legal lot" and permitted her to use an alternative septic system. No notice of the application for waiver was given to the residents of the subdivision—the persons from whom she had extracted a premium based on the reserve lot remaining undeveloped.

In September, 1997, the county granted a conditional waiver, but even that proved to be ineffective, as the county health department construed one of the conditions as still requiring the 10,000 square foot drainage area. In January, 1998, after repeated failures, the parcel finally passed a percolation test, and the health department approved a standard septic system, with the 10,000 square foot drainfield. Unfortunately for Ms. Stansbury, that drainfield could only be placed on a small flat portion of the lot and, given the topography of the lot, that served to restrict the buildable area in a way that rendered the lot non-buildable absent the granting of fifteen variances. That is the hardship upon which Ms. Stansbury relies. That is the hardship that the Court finds, as a matter of law, was not self-inflicted.

What was significant to the Board of Appeals, and what the Court simply ignores, is that, when Stansbury and her brother re-platted the property in 1991, all of the applicable land use controls that made the reserve parcel non-buildable absent the granting of variances were in place. They knew, or at least should have known, when they went about reconfiguring the property that, if they re-platted it as they did, they would likely end up with a non-conforming lot. Evidence was presented to the board from David Blaha, a land and environmental planner whom the board accepted as an expert, that the property could have been re-subdivided to provide either a reserved parcel or a thirty-eighth legal lot that would not have encroached on steep slopes or the critical area buffer and that would not, therefore, have needed any of the requested vari-

ances. He offered exhibits to show how that could have been done. His testimony was unrebutted and was found by the board to be persuasive.

In reaching its conclusion that the need for fifteen separate variances was not self-created, as a matter of law, the Court dismisses as inapplicable Maryland and out-of-State cases pointing to an exactly opposite conclusion. I believe that the Maryland and out-of-State cases *are* in point. Moreover, they are consistent with other out-of-State cases that the Court fails even to cite. Let me deal first with the Maryland cases.

In *Salisbury Bd. v. Bounds,* 240 Md. 547, 214 A.2d 810 (1965), the owner purchased a large frame house that had been a single-family residence and desired to convert it to four apartments. The zoning law required both a permit for such conversion and a minimum of 2,500 square feet per apartment. As the house contained less than 10,000 square feet, it could accommodate only three apartments. Nonetheless, the owner proceeded to build four apartments without obtaining the necessary permit and, upon discovering his mistake, sought a variance. Holding that he was not entitled to one, we followed the law as stated in 2 ARDEN H. RATHKOPF & DAREN A. RATHKOPF, THE LAW OF ZONING AND PLANNING § 48–1, that, in order to be entitled to a variance on the ground of hardship, the restrictions of the ordinance, coupled with the unique circumstances affecting the property, must be the cause of the hardship. Thus:

> "If the peculiar circumstances which render the property incapable of being used in accordance with the restrictions contained in the ordinance have been themselves caused or created by the property owner or his predecessor in title, the essential basis of a variance, i.e., that the hardship be caused *solely* through the manner of operation of the ordinance upon the particular property, is lacking. *In such case, a variance will not be granted; the hardship, arising as a result of the act of the owner or his predecessor will be regarded as having been self-created, barring relief. This rule is simple and of general application in the several states.*"

*Salisbury Bd.* at 554, 214 A.2d at 814 (emphasis in last two sentences added). Noting that, aside from the fact that the hardship was self-inflicted, it was also shown to be "of a purely financial nature," we concluded that the case "fits squarely within the above *general* rule." *Id.* at 555, 214 A.2d at 814–15 (emphasis added).

We followed that reasoning in *Randolph Hills v. Mont. Co. Council,* 264 Md. 78, 285 A.2d 620 (1972). The developer there purchased a residentially zoned tract of 380 acres, part of which abutted a railroad right-of-way. It developed most of the tract for residential purposes but deliberately left undeveloped a wedge of the property, approximately 1,900 feet long, of which 1,600 feet ranged only from 50 to 100 feet in width, bordering the right-of-way. The developer, claiming hardship, then sought a special exception to permit that wedge to be used for the parking of motor vehicles in conjunction with some industrial land lying to the north. The zoning agency denied the request on the ground that any hardship was self-created, and we affirmed. Confirming again our adherence to the general rule as stated by Rathkopf, we noted our complete agreement with the view of the Circuit Court that " 'the use of the particular ground in question is restricted *because the applicant chose to develop as it did.*' " *Id.* at 82, 285 A.2d at 622 (quoting the opinion of the Circuit Court). *See also Montgomery County Council v. Kacur,* 253 Md. 220, 252 A.2d 832 (1969).

The Court dismisses *Salisbury Bd.* (and the similar case of *Marino v. Mayor and City Council of Baltimore,* 215 Md. 206, 137 A.2d 198 (1957)) on the curious ground that the action creating the hardship was taken "without any consideration by the appropriate city entities as to whether the conversion complied with local zoning provisions," and it dismisses *Randolph Hills* and *Kacur* on the ground that they involved requests for reclassification, rather than for variances, and are therefore governed by the "change/mistake" rule. I fail to see how either constitutes a distinction. What the Court simply ignores is the *basis* for those decisions—the general rule that one cannot rely on hardship to justify *any* discretionary

zoning change if the hardship was self-inflicted, and that a hardship will be regarded as self-inflicted if it was created deliberately and could have been avoided. As Rathkopf noted, that is the law throughout the country (except, after today, in Maryland).

The Rathkopfs continue in the belief that "[v]ariances generally will not be granted when courts determine that the hardship was created by an affirmative act by the owner or his predecessor." 3 ARDEN H. RATHKOPF & DAREN A. RATHKOPF, THE LAW OF ZONING AND PLANNING § 58.21(Edward H. Ziegler, Jr. ed.2002). No distinction in this regard is drawn between requests for reclassifications and requests for variances, and, indeed, the quoted statement refers specifically to variances. They state:

"Division of property in such a fashion as to leave part in non-conformity with the minimum lot size, width, or frontage provisions is a common occurrence, and, on application for a variance for the lot thus rendered substandard, the hardship arising from the inability to put the substandard lot to use is usually considered self-created."

*Id.*

The Rathkopfs note that, in some instances, evidence of good faith on the part of the applicant may suffice to eliminate the bar of self-creation of the hardship—as where the applicant has attempted to use alternatives to relieve the hardship prior to requesting a variance, or has relied on representations of zoning authorities, or had no actual or constructive knowledge of the requirements or limitations. None of those excuses applies to Ms. Stansbury, of course.

The Rathkopfs are not alone in their view. Most of the recognized commentators make the same point. *See* 5 NORMAN WILLIAMS, JR. & JOHN M. TAYLOR, AMERICAN PLANNING LAW § 146.01 (1985 rev.). Young makes the point that "[a]lthough there is some division of opinion as to whether the self-created hardship rule should be applied in area variance cases, there is general agreement that a variance may not be granted to the owner of a substandard lot where such lot was created by the

deliberate conduct of the applicant." 3 KENNETH H. YOUNG, ANDERSON'S AMERICAN LAW OF ZONING § 20.59 (4th ed. 1996 & Supp. 2002). Until *Sasso v. Osgood,* 86 N.Y.2d 374, 633 N.Y.S.2d 259, 657 N.E.2d 254 (1995), New York did not generally apply the doctrine of self-created hardship to area variances, but even under that approach, which *Sasso* changed, the courts disapproved the granting of relief to owners of substandard lots that were created by the deliberate conduct of the applicant. *See Chasanoff v. Silberstein,* 6 N.Y.2d 807, 188 N.Y.S.2d 194, 159 N.E.2d 684 (1959); *Kenny Dev. Corp. v. Kramer,* 22 Misc.2d 122, 202 N.Y.S.2d 421 (1960).

Courts have routinely rejected any distinction between area and use variances in this regard and have denied area variances when the need for them has been self-created. In *Sciacca v. Caruso,* 769 A.2d 578 (R.I.2001), the applicant subdivided a lot into two lots knowing that the newly created undeveloped lot was not in conformance with dimension requirements and then sought a variance. The Rhode Island Supreme Court reversed the granting of the variance and rejected the notion that the doctrine of self-created hardship did not apply to area variances, finding no reasonable basis for such a distinction.

In *Herman v. Board of Adjustment,* 29 N.J.Super. 164, 102 A.2d 73 (App.Div.1953), a subdivision plat was recorded in 1941. One of the lots—No. 13—had a frontage of 51 feet and a depth of 129 feet, which gave it an area of less than 7500 feet. In 1948, a zoning law was adopted that excluded from the general restrictive provisions of the ordinance previously recorded lots having a frontage of at least 50 feet and an area of at least 7500 square feet. Lot 13 was sold to Reid Development Company in 1949, although the deed was not recorded until March, 1950. Between the time of sale and the recording of the deed, an amendment to the zoning law was introduced that would have precluded the construction of a dwelling house on any lot with a frontage or depth such as that of Lot 13. While that bill was pending, the principal of Reid, an attorney, caused Reid to sell to his wife a number of the lots, including Lot 13, but assured that the lots sold to his

wife were interspersed with those retained by Reid, so that none of the ones sold to the wife were contiguous to one another. The deed, prepared in May, 1950, was not recorded until late September—six days before the ordinance was enacted. That ordinance was later invalidated for procedural reasons but was re-enacted in 1952. The 1952 ordinance also prohibited construction of a dwelling house on a lot with the frontage and size of Lot 13 but provided that a bona fide owner who acquired title to a lot having a frontage of less than 75 feet prior to the effective date of the ordinance could obtain a variance.

The wife applied for a variance, asserting as a hardship the lack of requisite frontage and the absence of contiguity with other lots that would allow a combination to meet the frontage requirement. The zoning board denied the variance, and the appellate court affirmed. The court focused on the absence of contiguity and questioned whether the isolation of the lot, occasioned by the interspersing of the lots conveyed to the wife with those retained by the husband's corporation, was premeditated and contrived to circumvent the anticipated zoning regulations. That, it held, was an issue of fact, and the findings of the zoning agency were entitled to deference. As (until today) has been the well-established rule in Maryland as well, the New Jersey court applied the principle that the agency's denial of a variance "is presumptively correct and proper and the party impugning the determination on appellate review encounters the burden of proving to the contrary." *Id.* at 74–75. On the record in the case, the court affirmed the implicit finding of the agency that the isolation of the lot, which alone made it eligible for a variance, was "adroitly purposeful in an anticipated effort to avoid the restrictions of the expected ordinance" and therefore did not constitute an exceptional or undue hardship. *Id.* at 77.

In *In Re Volpe's Appeal,* 384 Pa. 374, 121 A.2d 97 (1956), the petitioner purchased two lots—Lots 14 and 15. They contained a total of 32,500 square feet but neither contained 20,000 square feet. The zoning law precluded building on a lot with less than 20,000 square feet. In 1949, the petitioner

conveyed all of Lot 15 and a portion of Lot 14—a total of 20,130 square feet—to Foster, who erected a house on the property. That left petitioner with a portion of Lot 14 consisting of less than 12,500 square feet. He then sought a variance with respect to Lot 14, claiming hardship. The agency denied the request and the Pennsylvania Supreme Court affirmed, holding that any hardship was self-created "with full knowledge of the restrictions in the zoning ordinance." *Id.* at 100. The court noted the obvious, that "[i]f we were to hold that this petitioner suffered unnecessary hardship, every other property owner in the area classified 'AA' residential, would similarly be entitled to build his home on a lot of 12,000 square feet, which of course would nullify the ordinance." *Id.*

*Volpe* has been applied by the Pennsylvania courts in several later cases. In *Borough of Baldwin v. Bench,* 11 Pa. Cmwlth. 410, 315 A.2d 911 (1974), the appellant's father had laid out fifteen lots, one of which had only a 40 foot frontage. The zoning law required lots to have a 55 foot frontage for a single family dwelling. Appellant acquired the non-conforming lot and applied for a variance. The agency denied the request, and the court affirmed, noting that the father had developed the property "in such a fashion that an undersized lot was created." *Id.* at 913. The court concluded:

> "Since his father would have been barred from receiving a variance because his hardship was self-inflicted, Bench must also be barred. To decide otherwise would be to completely emasculate the holding in *Volpe,* since a land developer, like the applicant in *Volpe,* need only deed the property to a member of his family in order to circumvent the holding of the Supreme Court."

*Id.*

In *Ephross v. Solebury Township Zoning Hearing Bd.,* 25 Pa.Cmwlth. 140, 359 A.2d 182 (1976)—a case almost identical to this one—a developer, fully aware that the applicable zoning law required one-acre lots, laid out a subdivision that contained 22 conforming lots and two that contained less than an acre each. The developer's assignee then sought variances

with respect to one of the non-conforming lots, claiming hardship. The request was denied by the agency, and that decision was affirmed. In reasoning that should control in this case, the court stated:

"We also agree with the authorities below in their conclusion that an experienced developer who purchases a large subdivision with express knowledge of existing zoning regulations and their applicability to that subdivision cannot be allowed to frustrate an express provision of a zoning ordinance by developing a vacant irregular lot in violation of the law. *The law does not permit a developer to subdivide its own land and then make a subsequent claim for a variance because a remnant of that land is not in conformity with the zoning ordinance.*"

*Id.* at 184 (emphasis added). *See also Booe v. Zoning Board of Appeals of City of Shelton,* 151 Conn. 681, 202 A.2d 245 (1964) (where owner purchased 70 acres of land in rural district and later sold all but four acres, owner not eligible for variance in order to build hotel on remaining property when zoning law required minimum of five acres).

The Court fails even to cite these out-of-State cases, which seem to me to be very much in point.

On the record before us, this should be a "slam dunk" case of self-inflicted hardship. Ms. Stansbury, for no reason other than to maximize her economic gain, knowingly and deliberately created a non-conforming lot when it was not necessary to do so. She even used the inability to develop the reserved parcel as a means to extract premiums from the sale of other lots, and then came crying to the zoning authorities that she had a hardship on her hands. The board of appeals, after hearing the witnesses, determined, as a *fact,* that the hardship was self-created. Normally, we defer to the factual determinations of the agency, but, in its peculiar desire to reward Ms. Stansbury for her deliberate conduct, the Court today throws both zoning law and established administrative law to the wind. We should leave Ms. Stansbury with the hardship she

created and not open up vast new stratagems for developers to circumvent land use laws designed to protect everyone else.

Judge RAKER has authorized me to state that she joins in this dissenting opinion.